**UNITED STATES of America,**
**Plaintiff–Appellant,**

v.

**Michael Lynn SMITH,**
**Defendant–Appellee.**

No. 89–5182.

United States Court of Appeals,
Sixth Circuit.

Argued Sept. 21, 1989.
Decided April 4, 1990.

Joe B. Brown, U.S. Atty., Office of the U.S. Atty., Nashville, Tenn., Michael C. Olmsted, Trial Atty. (argued), Theodore S. Greenberg, U.S. Dept. of Justice, Washington, D.C., for plaintiff-appellant.

Thomas Buchanan, Washington, D.C., N. Reese Bagwell (argued), Clarksville, Tenn., for defendant-appellee.

Edmund L. Carey, Jr. (argued), Neal & Harwell, Nashville, Tenn., for amicus curiae, Tennessee Ass'n of Criminal Defense Lawyers and American Civil Liberties Union of Tennessee.

Before MERRITT, Chief Judge, KRUPANSKY, Circuit Judge, and GRAHAM, District Judge [*].

MERRITT, Chief Judge.

The United States appeals the denial of a proposed protective order under a government secrecy statute known as the Classified Information Procedures Act, 18 U.S.C. app. IV (1988),[1] an enabling statute delegating to the Chief Justice authority to issue regulations governing the security clearance of judicial employees in cases in which classified information is admitted. Section 4 of the regulations issued by the Chief Justice provides that "[a]ny problem of security involving court personnel or persons acting for the court shall be referred to the court for appropriate action." The issue presented on appeal is whether various police and intelligence agencies of the Executive Branch may, in accordance with their standard security clearance procedures, investigate Judicial Branch employees whom the court has designated to work on a criminal proceeding involving classified information. In light of the provision of section 4 in which the Judicial Branch retains authority to resolve "any problems of security" arising from the administration of the system of security clearances, we hold that such investigations do not violate the principle of separation of powers. We therefore reverse the decision below.

I

According to the indictment, Major Michael L. Smith transported and concealed stolen goods, possessed an unregistered silencer, and possessed a silencer without a serial number. The government alleges that Major Smith illegally obtained $60,000 worth of weapons which Army investigators discovered during a consent search of the major's house. According to the government, when he allegedly stole the weapons, Major Smith was a member of the "Intelligence Support Activity," an Army unit with classified, undisclosed duties. Because the prosecution and defense of this case is said to involve classi-

---

[*] The Honorable James L. Graham, United States District Court for the Southern District of Ohio, sitting by designation.

1. Congress enacted the Classified Information Procedures Act to deter the practice of "greymail" in cases involving government secrets. "Greymail" occurs when a defendant seeks to disclose classified information as part of his or her defense, requiring the government either to permit disclosure or to dismiss the prosecution. The Act permits the government to have the trial court examine classified information *in camera* and *ex parte* and determine whether it is necessary for the defense, or if a proffered substitution would suffice to protect the defendant's constitutional rights and the secrecy of the information. 18 U.S.C. app. IV (1988).

fied information relating to Smith's duties, the United States moved for protection of the information under section 3 of the government secrecy statute, 18 U.S.C. app. IV § 3 (1988). The proposed protective order would require court employees, e.g., law clerks and secretaries, to submit to government investigation and clearance before being permitted to handle any classified information.

District Judge Wiseman issued an order protecting the classified information. He did not, however, honor the government's request that the Executive Branch perform background investigations on all courtroom personnel. Instead, Judge Wiseman specified particular individuals, including a secretary and a law clerk, whom he designated as authorized to have access to classified information. Those designated individuals would, according to Judge Wiseman's order, be required to sign a memorandum of understanding, a document indicating that the signer understands the possible dangers to the United States posed by unauthorized release of classified information. When the designated security officer asked Judge Wiseman whether he should arrange for clearances for the personnel, the Judge said it would not be necessary. *See United States v. Smith*, 706 F.Supp. 593, 594–96 (M.D.Tenn.1989).

The United States moved for reconsideration. It argued that the security regulations that Chief Justice Burger promulgated pursuant to section 9 of the Act[2] (hereinafter "Burger regulations") required Judge Wiseman to permit the Executive Branch to perform background checks on all courtroom personnel before the court received any classified information. Section 4 of the Burger regulations states that

No person appointed by the court or designated for service therein shall be given access to any classified information in the custody of the court, unless such person has received a security clearance as provided herein and unless access to such information is necessary for the performance of an official function....

The court shall inform the court security officer or the attorney for the government of the names of court personnel who may require access to classified information. That person shall then notify the Department of Justice Security Officer, who shall promptly make arrangements to obtain any necessary security clearances and shall approve such clearances under standards of the Executive Branch applicable to the level and category of classified information involved....

. . . .

Any problem of security involving court personnel or persons acting for the court shall be referred to the court for appropriate action.

In a comprehensive opinion designed to maintain the independence of the Judicial Branch, Judge Wiseman denied the motion. Finding that the "CIPA procedures ... invite executive officials into a court's chambers and authorize them to dictate to federal judges the manner in which they conduct their business," he held that section 4 of the Burger regulations violated the constitutionally-mandated separation of powers and the independence of the judiciary. *See Smith*, 706 F.Supp. at 594.

After Judge Wiseman denied the motion for reconsideration, the United States brought an interlocutory appeal to this Court pursuant to § 7(a) of the Act. That section provides that an interlocutory appeal may be taken "from a decision or order of a district court in a criminal case authorizing the disclosure of classified information...." Because Judge Wiseman's order is said to have the effect of permitting the disclosure of classified information

---

**2.** The Act states in pertinent part:

[T]he Chief Justice of the United States, in consultation with the Attorney General, the Director of Central Intelligence, and the Secretary of Defense, shall prescribe rules establishing procedures for the protection against

unauthorized disclosure of any classified information in the custody of the United States district courts, courts of appeal, or Supreme Court.

18 U.S.C. app. IV § 9(a) (1988).

to putatively unauthorized persons, we have appellate jurisdiction under § 7(a).

## II

Section 9 of the Act directed the Chief Justice of the United States—then Chief Justice Burger—to establish procedures ensuring the security of the classified information while a court is using it. Congress intended these procedures to be basic "housekeeping rules," covering "where safes are to be located, who is to have the combinations, *how many court employees can have access to the documents,* and the like." H.R.Rep. No. 831, 96th Cong., 2d Sess., pt. 2, at 8 (1980) (emphasis added). Congress did not further delineate what procedures the Chief Justice should adopt with regard to background checks of personnel.

The Burger regulations explicitly provide that court personnel must undergo a security examination designed and conducted by Executive Branch personnel. On the question of who shall have the final authority to decide which judicial employees may see the classified information after the background check is performed, section 4 of the regulations states that "[a]ny problem of security involving court personnel or persons acting for the court shall be referred to the court for appropriate action." Because Judge Wiseman forbade the Department of Justice from engaging in the first step under the regulations, i.e., performing background checks, the only question ripe for review is whether the Executive Branch may constitutionally investigate the backgrounds of court personnel prior to their participation in a case involving classified information. Only if the Justice Department actually performed a security check on Judge Wiseman's court personnel and denied one or more of them clearance would the final authority issue require judicial resolution.

We analyze the separation of powers issue first by referring to the methods for protecting classified information employed by the special Foreign Intelligence Court and the Legislative Branch—the methods which Congress and Chief Justice Burger seemed to have had in mind in adopting the security provisions at issue here. We will explain those analogous procedures for the light they shed on the separation of powers question presented in the instant case. In the case of the Foreign Intelligence Court and the Legislative Branch, the Court and Congress respectively appear to retain final authority over the security clearance process after background checks are performed.

The legislative history of section 9 is sparse, and states only that Congress based that section on a similar provision under the Foreign Intelligence Surveillance Act, 50 U.S.C. § 1803(c) (1982) ("Surveillance Act"). *See* S.Rep. No. 823, 96th Cong., 2d Sess. 11 (1980), *reprinted in* 1980 U.S.Code Cong. & Admin.News 4294, 4305. Congressional committees drafted and developed both provisions to delegate rulemaking authority for security procedures to a panel of the Chief Justice and three national security executive officials. The security procedures established by Chief Justice Burger for the special court[3] created under the Surveillance Act "to hear applications for and grant orders approving electronic surveillance anywhere within the United States," provide, in pertinent part, that court personnel

shall undergo appropriate background investigation by the Federal Bureau of Investigation under the standards established by Director of Central Intelligence Directive No. 1/14 ... or successor directives as concurred in by the Attorney General. These personnel shall not have access to classified information unless they have received *a security clearance determined appropriate by the court* in

---

**3.** The surveillance statute states in pertinent part:

The Chief Justice of the United States shall publicly designate seven district court judges from seven of the United States judicial circuits who shall constitute a court which shall

have jurisdiction to hear applications for and grant orders approving electronic surveillance anywhere within the United States under the procedures set forth in this Act....

50 U.S.C. § 1803(a) (1982).

consultation with the Attorney General and the Director of Central Intelligence. All court personnel having access to court records shall sign appropriate security agreements. If a question concerning the security clearance of court personnel is raised subsequent to appointment, *the matter shall be referred to the court* which may consult the Attorney General and the Director of Central Intelligence regarding its security significance before taking such action as it deems appropriate.

Foreign Intelligence Surveillance Act Security Procedures ¶ 4, *reprinted in* Implementation of the Foreign Intelligence Surveillance Act, H.R.Rep. No. 558, 96th Cong., 1st Sess. 8 (1979) (emphasis added). The security procedures promulgated pursuant to the Surveillance Act demonstrate that Congress, in analogous circumstances, has subjected the Judiciary, in this case the Surveillance Court, to security measures designed and administered by the Department of Justice.

The Legislative Branch also has delegated responsibility for safeguarding the flow of classified information. The Senate Resolution establishing the Select Committee on Intelligence states that employees of the Committee, or persons performing services for or at the Committee's request, cannot have access to classified information unless they agree to be bound by the Committee's confidentiality requirements. *See* S.Res. 400, 94th Cong., 2d Sess. § 5(b) (1976), *reprinted in* 122 Cong.Rec. 4755 (1976). Further, before gaining access to classified materials, they must "receive[ ] an appropriate security clearance as determined by such committee in consultation with the Director of Central Intelligence." *Id.* This practice is followed by the House of Representatives as well. There, the Permanent Select Committee on Intelligence performs the equivalent function of the Senate Committee,[4] and has chosen to be guided by identical security procedures. *See* Rules of the House of Representatives,

101st Cong., Rule XLVIII, § 5, at 30 (rev. ed. 1989).

It is evident from both Houses' method of protecting classified information that the Legislative Branch has determined that the participation of the Executive Branch in designing and administering security measures is not in itself an intrusion that rises to the level of an unconstitutional interference with its legislative function. In accommodating the interests of the Judicial and Executive Branches in the instant case, we are influenced by the accommodation offered by the legislative committees as well as that offered by the Surveillance Court under the Surveillance Act described above. In making this accommodation, the district courts retain the same level of protection that the Surveillance Court and legislative committees retain against the possibility of overly intrusive inquiries which the Executive might engage in pursuant to its investigation of courtroom personnel.

### III

The accommodation of the interests of the three branches mentioned above has its roots in the historical deference paid to the Executive on issues of national security. For example, in *Totten v. United States,* 92 U.S. 105, 106, 23 L.Ed. 605 (1875), the Court recognized the power inherent in the Executive, through the President, to make contracts with secret agents to "enter the rebel lines and obtain information respecting the strength, resources, and movements of the enemy" in times of war. Recognizing the President's power to make such contracts, the Court stated that courts of justice—being open to the public—should not be used for trials

> which would inevitably lead to the disclosure of matters which the law itself regards as confidential, and respecting which it will not allow the confidence to be violated. On this principle, suits cannot be maintained which would require a disclosure of the confidences of the confessional, or those between husband and

---

**4.** Section 2(a) of Rule XLVIII of the Rules of the House of Representatives states that "[t]here shall be referred to the select committee all

proposed legislation, messages, petitions, memorials, and other matters relating to [intelligence]...."

wife, or of communications by a client to his counsel for professional advice, or of a patient to his physician for a similar purpose. Much greater reason exists for the application of the principle to cases of contract for secret services with the government, as the existence of a contract of that kind is itself a fact not to be disclosed.

*Id.* at 107. Similarly, by recognizing the need for secrecy in the area of foreign relations, the Court has deferred to the judgment of the Executive to preserve national security and to guard against the unwanted dissemination of political and military secrets:

> [E]ven if courts could require full disclosure, the very nature of executive decisions as to foreign policy is political, not judicial. Such decisions are wholly confided by our Constitution to the political departments of the government, Executive and Legislative. They are delicate, complex, and involve large elements of prophecy. They are and should be undertaken only by those directly responsible to the people whose welfare they advance or imperil. They are decisions of a kind for which the Judiciary has neither aptitude, facilities nor responsibility and which has long been held to belong in the domain of political power not subject to judicial intrusion or inquiry.

*Chicago & S. Air Lines v. Waterman Steamship Corp.*, 333 U.S. 103, 111, 68 S.Ct. 431, 436, 92 L.Ed. 568 (1948) (citations omitted); *see also United States v. Curtiss–Wright Export Corp.*, 299 U.S. 304, 320, 57 S.Ct. 216, 221, 81 L.Ed. 255 (1936) ("Secrecy in respect of information gathered by [confidential sources of information] may be highly necessary, and the premature disclosure of it productive of harmful results."); *Oetjen v. Central Leather Co.*, 246 U.S. 297, 302, 38 S.Ct. 309, 310, 62 L.Ed. 726 (1918) ("The conduct of the foreign relations of our Government is committed by the Constitution to the Executive and Legislative—'the political'— Departments of the Government, and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision.").

Clearly the indictment of Major Smith, a member of the "Intelligence Support Activity," for stealing weapons and ammunition from the United States Government, implicates the broad authority of the Executive Branch to exercise its discretion in matters that touch national security and foreign affairs.

## IV

District Judge Wiseman's concerns about preserving the judiciary from unwarranted encroachment by co-equal branches are firmly rooted in the Constitution and Supreme Court precedents. Under no circumstances should the Judiciary become the handmaiden of the Executive. The independence of the Judiciary must be jealously guarded at all times against efforts by prosecutors to erode its authority. The Constitution commands that the " 'judicial power of the United States' must be reposed in an independent Judiciary," *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 60, 102 S.Ct. 2858, 2865, 73 L.Ed.2d 598 (1982), "free from potential domination by other branches of government." *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 848, 106 S.Ct. 3245, 3255, 92 L.Ed.2d 675 (1986) (quoting *United States v. Will*, 449 U.S. 200, 218, 101 S.Ct. 471, 482, 66 L.Ed.2d 392 (1980)). However, the Supreme Court also has confirmed the government's "compelling interest in protecting both the secrecy of information important to our national security and the appearance of confidentiality." *Snepp v. United States*, 444 U.S. 507, 509 n. 3, 100 S.Ct. 763, 765, 62 L.Ed.2d 704 (1980). Although permissible measures taken to satisfy this compelling interest would not include those that cause "the encroachment or aggrandizement of one branch at the expense of the other," *Buckley v. Valeo*, 424 U.S. 1, 122, 96 S.Ct. 612, 683, 46 L.Ed.2d 659 (1976) (per curiam), the requirement of the Burger regulations that courtroom personnel be subject to background checks before gaining access to classified information does not in

itself threaten such a result. Such a requirement affecting law clerks, secretaries and bailiffs is not closely related to the deliberative process because these individuals do not and should not decide cases; thus it only mildly intrudes into the manner in which federal judges conduct business. *See In re United States Department of Justice*, No. 87–1205, slip. op. at 4 (4th Cir. Apr. 7, 1988) (unpublished disposition) (in issuing writ of *mandamus* that required security clearances for courtroom staff in civil case, court concluded that contempt or disclosure dilemma justified "minimally intrusive" requirement of routine security clearance). Under section 4 of the Burger regulations, district courts retain sufficient power to preclude the Executive from engaging in procedures that intrude upon both the judicial function and, potentially, the privacy interests of court personnel. Proper administration of the regulations is therefore consistent with the doctrine of separation of powers.

## V

We therefore hold that the Executive Branch may conduct reasonable background investigations, subject to district court review, of judicial personnel before such personnel are cleared to work on a case involving classified information. The security clearance procedures established under the Burger regulations do not on their face, or as applied in this case so far, violate principles of separation of powers. Because the District Court precluded the Executive from performing any initial background checks in this case, the propriety of the checks themselves is not at issue.

Accordingly, we reverse the judgment of the court below. The case is remanded to the District Court with instructions to permit the Executive Branch to perform background checks as described in section 4 of the Burger regulations.