Michelle BRILL, et al., Plaintiffs,

v.

Kay HEDGES, et al., Defendants.

No. C-2-90-0701.

United States District Court,
S.D. Ohio, E.D.

Nov. 20, 1991.

Theodore Kern, Ohio State Legal Services Ass'n, Columbus, Ohio, Gary M. Smith, Southeastern Ohio Legal Services, New Philadelphia, Ohio, for plaintiffs.

Karin E. Wilson, Asst. Atty. Gen., State of Ohio Health and Human Services Section, Columbus, Ohio, Walter H. Chess, Jr., Asst. Pros. Atty., Zanesville, Ohio, for defendants.

## OPINION AND ORDER

KINNEARY, Senior District Judge.

This matter comes before the Court to consider the cross motions of the parties for summary judgment. Fed.R.Civ.P. 56. On June 24, 1991, the Court issued an Opinion and Order that, while accepting the Defendants' contention that the statute at issue in this case is only subject to the lowest level of constitutional scrutiny, directed the parties to re-brief the issue of whether the statute is rationally related to any legitimate state interest. Both parties have now filed supplemental briefs with the Court.

## FACTS

The undisputed facts in this case are as follows. Plaintiff Michelle Brill was divorced from her husband on July 8, 1988. Because her attorney had informed her that returning to her maiden name (Walton) would be a difficult and expensive process, she retained Brill as her surname.

On December 19, 1989, Brill gave birth to a son whom she named Stephen James Walton. It is not disputed that Brill was not married at the time of conception, at the time of birth, or any time in between. It is also not disputed that Stephen is not the son of Brill's former husband.

After the birth of Stephen, Brill applied for and obtained a Social Security card for her son issued under the surname Walton. However, when she attempted to record the birth of her son with the Zanesville–Muskingum County Health Department, she was informed that Ohio law required her to record her child's birth under her own current surname. Ohio Revised Code section 3705.09(F) provides:

> If the mother of a child was married at the time of either conception or birth or between conception and birth, the child shall be registered in the surname designated by the mother....
>
> If the mother was not married at the time of conception or birth or between conception and birth, the child shall be registered by the surname of the mother. The name of the father of such child shall also be inserted on the birth certificate if both the mother and the father sign the birth certificate as informants before the birth record is accepted for filing by the local registrar and in such a case the child may be registered by the surname of the father if the mother and father so designate....

Michelle Brill and her son filed this action—later certified as a class action—to obtain a "declaration from this Court that she has a constitutionally protected right to choose her son's name, a declaration that Stephen James Walton has a constitutionally protected right to be known by a surname associated with his family, and an order from this Court requiring defendants to accept registration of Stephen's birth under the surname Walton." The Plaintiffs also request that this Court declare section 3705.09(F) unconstitutional insofar as it restricts unmarried parents from choosing the surname under which they register their children, as it permits married parents to do.

On June 24, 1991, this Court held that while the right to name a child has consid-

erable importance in our society, it does not rise to the level of a "fundamental right." Similarly, the Court found that the distinction between married and unmarried mothers does not involve a "suspect class." Thus, the statute must be upheld if it bears some reasonable relationship to a legitimate state interest. Based on the record before it, the Court was unable to make this determination, and it directed the parties to re-brief the issue with the standard of review in mind. Both parties have since provided the Court with supplemental briefs.

## DISCUSSION

■ The burden upon a party seeking to overturn a legislative enactment for impinging upon a constitutionally-protected due process right, or irrationally discriminating between groups in violation of the equal protection clause, is an extremely heavy one.[1] When the legislation is economic or social in nature, as in this case, and neither a fundamental right nor a suspect class is involved, the level of scrutiny is rational basis review:

> It is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it.

*United States v. Fogarty,* 692 F.2d 542, 547 (8th Cir.1982), *cert. denied,* 460 U.S. 1040, 103 S.Ct. 1434, 75 L.Ed.2d 792 (1983) (quoting *Williamson v. Lee Optical, Inc.,* 348 U.S. 483, 488, 75 S.Ct. 461, 464, 99 L.Ed. 563 (1954)). *See also McGowan v. Maryland,* 366 U.S. 420, 426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961) ("[a] statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it"). Thus, states are not required to convince the courts of the correctness of their legislative judgments. Rather, "those challenging the legislative judgment must convince the court that the legislative facts on which the classification is

apparently based could not reasonably be conceived to be true by the governmental decisionmaker." *Vance v. Bradley,* 440 U.S. 93, 111, 99 S.Ct. 939, 949, 59 L.Ed.2d 171 (1978). In short, "the judiciary may not sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines ..." *New Orleans v. Dukes,* 427 U.S. 297, 303, 96 S.Ct. 2513, 2517, 49 L.Ed.2d 511 (1975); *see also Schweiker v. Wilson,* 450 U.S. 221, 230, 101 S.Ct. 1074, 1080, 67 L.Ed.2d 186 (1980) ("Unless a statute employs a classification that is inherently invidious or that impinges on fundamental rights, areas in which the judiciary then has a duty to intervene in the democratic process, this Court properly exercises only a limited review power over Congress, the appropriate representative body through which the public makes democratic choices among alternative solutions to social and economic problems.").

In its original brief, the state identified three interests which it maintains are served by requiring that the child of an unwed mother be given the current surname of the mother. First, it claims that this requirement serves to ensure that there will be an identifiable legal connection between a child and his or her only legally identifiable parent. This is important, the state alleges, not only for maintaining an efficient and effective record keeping system, but also for verifying and documenting the genetic relationship between mother and child.

Second, the state alleges that the system assists in maintaining the traceability of the ancestral chain. This, the state claims, may assist in future detection of genetic disease and defect.

Third, the state maintains that the system promotes the preservation of family life. By requiring that an unmarried mother and her child maintain the same sur-

---

1. The distinction between the concepts of equal protection and due process is subtle, yet not without significant consequence. The equal protection clause of the fourteenth amendment requires the government to treat similarly situated individuals in a similar manner. Substan-

tive due process, on the other hand, protects specific fundamental rights of individual freedom and liberty from deprivation at the hands of arbitrary and capricious government action. *See Gutzwiller v. Fenik,* 860 F.2d 1317, 1328–29 (6th Cir.1988).

name, the state alleges that both mother and child are identifiably bound as a family by society.

Upon re-briefing, rather than expand upon the interests already alleged—as this Court directed it to do—the state chose to rest its position on a different state interest: preventing unmarried mothers from raising an "improper presumption of paternity." Before the enactment of the statute, the state asserts:

> unmarried mothers would select the surname of a man, such as a notable clergyman, as the name for their child. Frequently, this selection of a surname, other than the mothers [sic] own, was made in an effort to raise the presumption that the man was actually the biological father.

Defendants' Supplemental Brief, at 4.

With respect to the first interest asserted by the state—that the statute serves to maintain an identifiable legal connection between parent and child—the Court is rather skeptical. Initially, this Court is troubled by the language "identifiable legal connection." While the use of the term "legal" in this phrase suggests that it is intended to imply something more than the way the mother and child are viewed in their community, the state has not even attempted to define what a "legal connection" is, how it is created, and why it is an important state interest. Intuitively, it seems more likely that a "legal connection" between parent and child is entirely independent of the surnames associated with the mother and child.[2] Because the Certificate of Live Birth—which in this Court's view is what is intended by the phrase "identifiable legal connection"—only includes the maiden name of the mother and not her current surname, a legal connection is more likely to be established by allowing Michelle Brill to name her son Walton, since Michelle's maiden name of Walton

will appear on the birth certificate and not her current surname of Brill.[3]

In its attempt to explain its interest in maintaining an "identifiable legal connection" between mother and child, the state has identified two underlying rationales for its argument. First, it argues that an identifiable legal interest is important in maintaining an efficient and effective recording system. Second, it argues that it is important in verifying and documenting the genetic relationship between mother and child.

With respect to the first rationale, this Court fails to understand how allowing an unwed mother to choose the surname of her child impairs the efficiency or effectiveness of the state's recording system. Given that married mothers can choose any name they wish, the state has clearly established a recording system that can effectively accommodate choice in its operation. Nowhere has the state even attempted to differentiate the two situations or justify the existence of the disparity in treatment in terms of efficiency or effectiveness of the system. Furthermore, in relation to a constitutional deprivation, neither of these two interests is deserving of much weight:

> [T]he Constitution recognizes higher values than speed and efficiency. Indeed, one might fairly say of the Bill of Rights in general, and the Due Process Clause in particular, that they were designed to protect the fragile values of a vulnerable citizenry from the overbearing concern for efficiency and efficacy that may characterize praiseworthy government officials no less, and perhaps more, than mediocre ones.

*Stanley v. Illinois*, 405 U.S. 645, 656, 92 S.Ct. 1208, 1215, 31 L.Ed.2d 551 (1972) (footnote omitted).

With respect to the second rationale, that the statute aids in verifying and documenting the genetic relationship between moth-

---

**2.** This must be so since the state allows its citizens to change their surnames. Ohio Rev. Code § 2717.01. Thus, any "legal connection" based on a surname would be a fleeting one at best. Furthermore, any legal connection between parent and child is established by the

Certificate of Birth and through a paternity action. Ohio Rev.Code § 3111.03.

**3.** Furthermore, forcing the Plaintiff to name her son "Brill" actually creates a false connection to the Plaintiff's former husband, who is of no relation to the child.

er and child, the Court is equally skeptical. As presently constituted, Ohio's birth recording system always places the mother's—and usually the father's—name on the birth certificate. In the case of a mother, only her maiden name is required. Thus, regardless of any difference in surname between mother and child, any tracing is easily accomplished. Rather than trace by similarity of the surname—which this Court hardly need mention is not a reliable predictor of genetic relationship—one need only trace as one traces in a real property recording system.

With respect to the second interest identified by the state, that the system assists in genetic tracing, the fact that a difference in surnames between mother and child in no way hinders effective tracing of parent-child relationships disposes of this argument. Even if it did, the state would be hard pressed to explain how married mothers can be given a choice in surnames without hindering genetic tracing while unmarried mothers cannot be given a similar choice. The unequal treatment between these two—and the complete failure of the state to even attempt to explain the disparity in terms of genetic tracing—certainly calls into question the sincerity of the state in alleging the interest.

Next, the state maintains that the system promotes the preservation of family life. By requiring that an unmarried mother and her child maintain the same surname, the state claims that both mother and child are identifiably bound as a family by society. Initially, it should be noted that, once again, the state has failed to justify the disparity between married and unmarried mothers in terms of this asserted interest. If the preservation of family life is truly important to the state, and if requiring a mother to give her child her own current surname assists in maintaining that interest, then allowing married mothers—clearly the majority of mothers—

to give their children any surname they choose would not be a rational way to effectuate the state's asserted interest.

Furthermore, both in its initial and supplemental briefs, the state has completely failed to explain how the surname originally placed on a birth certificate is in any manner related to the "preservation of family life." Several observations on this point are in order. First, at least with respect to the state's asserted interest in ensuring that mother and child are identifiably bound as a family by society, it is apparent that the name appearing on the birth certificate has little, or possibly even no, effect on society's perception of the family unit. Rather, the actual relationship between mother and child, the lifestyle, the living arrangements, and many other factors combine to affect the manner in which society views a family as "identifiably bound." It is, at least in this Court's opinion, simply untenable for the state to argue that the name that appears on a legal document in a state recording system has any effect on family life. This is most apparent with respect to the facts of this particular case since Michelle Brill, the Social Security Administration, and the Plaintiff's community in general all know Brill's son by the name of Walton. The fact that Brill is the name that appears on Ohio's Certificate of Live Birth intuitively has no effect on the preservation of her family.

The insincerity of the state's position is exhibited by the fact that the state allows its residents—including minors—to change their names. Ohio Rev.Code § 2717.01. Thus, as the state correctly notes, Michelle Brill can somewhat lessen the hardship imposed upon her by Ohio Rev.Code § 3705.-09(F) by legally changing the surname of her son from Brill to Walton.[4] However, the availability of this procedure also lends itself to an alternative interpretation: if the state was truly interested in preserving the family, and if the state honestly

---

4. The Court notes, however, that this burden is only lessened, not removed, by the name change provision. For instance, a mother's right to name her child is the right to *initially* name her child, not just the right to change the name once the state has foisted a name upon the child.

Furthermore, the statutorily mandated procedure for changing the name of a minor child is not without its own burdens; section 2717.01 requires a court proceeding, prior notice by publication, and the consent of both parents.

thought that such preservation could only occur in family units in which a mother and her children have the same surname, then the state would not give to a minor child the ability to change his or her surname, and neither would it give to a mother the ability to change her surname to a name different from that of her child. Thus, while Ohio's name change procedure might to some degree lessen the burden of Ohio Rev.Code § 3705.09(F), it also calls into question the legitimacy of the state's asserted interests.[5]

The state's final alleged interest—and the only interest alleged in its supplemental brief—is that the Ohio statute prevents unwed mothers from raising an improper presumption of paternity. The state asserts that before the enactment of the statute, an unmarried mother was able to select the surname of an unrelated man for her child in an attempt to create a presumption that the man was the father of her child.

The difficulties with this asserted interest are numerous. First, the state has not attempted to explain the nature of the "presumption" which it alleges to arise when a mother gives to her child a name which is the same as the surname of an unrelated man in her community. If, by use of the word "presumption," the state is suggesting that a legal presumption arises, then the state is in error. Nowhere can this Court find any statutory language which either impliedly or expressly suggests that a legal presumption of paternity arises between a man and a child merely because the two have the same surname. In fact, a review of Ohio Rev.Code § 3111.03 reveals that a man is presumed to be the natural father of a child in numerous circumstances, none of which has to do with the similarity in surnames between the man and a child.[6] Furthermore, in a paternity action under § 3111.01 *et seq.*, a

man who is alleged to be the father of a child may introduce several types of evidence, including medical evidence, genetic tests, and expert opinions, in an effort to disprove the alleged paternity. Ohio Rev. Code § 3111.10. Thus, it is apparent that no legal presumption arises through the mother's choice of a surname for her child, and even if such a presumption were to arise, the existence of Ohio's paternity action allows for the quick resolution of any dispute.

The state's interchangeable use of the words "inference" and "presumption" suggests to this Court that rather than intimating that a similarity in surnames raises a legal presumption, the state is suggesting that a similarity in surnames raises an informal inference in the community that the man is the father of the child. This Court finds it difficult to believe that a mere similarity in surnames would lead anyone in today's society to draw such an inference from that fact alone. Indeed, one need only peruse the white pages of a telephone book—particularly the pages containing such surnames as Smith, Jones, Hall, and Johnson—to discover how little a surname is related to familial identity. That such an inference is actually drawn, that it happens to any great degree, that it causes any injury to any person, or that the statute was intended to prevent the situation from occurring, is not intuitively obvious and is not supported by any evidence in the record.

Even if the state is correct in its assertion that before the enactment of the statute mothers would frequently choose an unrelated surname in an attempt to create an untrue inference of paternity, and even if the state is correct that such a scheme was successful in creating the inference, Ohio's paternity statute provides a means of relief for any man wrongfully alleged to be the father of a child:

---

**5.** Additionally, if the state was truly sincere in its alleged interest, it would not allow married mothers to give to their children any name they desire—including one to which neither the mother nor her child has any legal or ancestral connection.

**6.** Section 3111.03 generally provides that a man is presumed to be the father of a child if he was married to, or attempted to marry, the mother of the child at certain specified times, or if he signed the child's birth certificate. Similarity of surnames, as one would expect, is inapposite to the question of paternity.

An action to determine the existence or nonexistence of the father and child relationship may be brought by the child or child's personal representative, the child's mother or personal representative, *a man alleged or alleging himself to be the child's father*, or the alleged father's personal representative.

Ohio Rev.Code § 3111.04 (emphasis added). Therefore, any wrongful presumption or inference that may arise due to a similarity in surnames between a man and a child can be corrected through a civil paternity action, thus making the state's asserted interest in § 3705.09(F) suspect.

■ Despite the Court's skepticism as to the sincerity and authenticity of the state's asserted interests, the Court cannot conclude that the statute fails to satisfy the rational basis test of the due process clause. It is well-established that this Court cannot substitute its judgment for the judgment of the legislative body that enacted the statute. Thus, while this Court would not have enacted the statute had it been given a choice, it cannot be said that the statute is in no way rationally related to the realization of legitimate state interests. For instance, while it appears somewhat doubtful that § 3705.09(F) has any effect whatsoever on the "preservation of family life" or the effectiveness of genetic tracing, this Court is simply not in the position to conclude that the state legislature was acting irrationally or capriciously. This same result obtains with respect to the state's interest in preventing improper presumptions of paternity; while the Court does not necessarily believe the asserted interest to be true, the Court is not willing to veto the judgment of the state legislators and conclude that they acted irrationally or capriciously.

■ However, with respect to the equal protection claim, a different result is mandated. While this Court is sensitive to the dangers inherent in judicial review of legislative acts, it is also highly cognizant of the judiciary's role as a protector of individual rights and freedoms. One of our most treasured rights vis-a-vis our government is the right to be treated the same as all others similarly situated. Like most rights, the right to equal protection of the laws is not absolute, and at least in the areas of social and economic legislation, the legislature may treat individuals similarly situated differently if such treatment is rationally related to a legitimate state interest.

With this in mind, the Court cannot but conclude that the difference in treatment given to married and unmarried mothers by § 3705.09(F) is simply unreasonable, irrational, and capricious, and most assuredly not related to the realization of any legitimate state interest. Indeed, the only state interest that even attempts to rationalize the distinction is that which was advanced in the state's supplemental brief, i.e. that the statute prevents improper presumptions of paternity. Aside from the fact that the manner in which this interest was initially raised suggests it to be merely an attempt at post hoc rationalization of an otherwise irrational statute, the Court is simply unwilling to accept the state's suggestion that the statute is in any way related to that interest. While the state, no doubt, has an interest in preventing improper presumptions of paternity, it is this Court's conclusion that the statute's distinction between married and unmarried mothers is simply unrelated to the realization of that interest. Because the classification is unrelated to any asserted state interest, this Court can only conclude that the classification is irrational and must be struck down as a violation of the equal protection clause of the fourteenth amendment.[7]

---

7. The Court notes that at least four federal district courts have overturned similar state statutes. *See Henne v. Wright,* 711 F.Supp. 511 (D.Neb.1989), *rev'd,* 904 F.2d 1208 (8th Cir. 1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 692, 112 L.Ed.2d 682 (1991); *Sydney v. Pingree,* 564 F.Supp. 412 (S.D.Fla.1982); *O'Brien v. Tilson,* 523 F.Supp. 494 (E.D.N.C.1981); and *Jech v.* *Burch,* 466 F.Supp. 714 (D.Haw.1979). The Eighth Circuit in *Henne v. Wright* is the only circuit to have previously considered the issue, and while it reversed the district court and found no constitutional violation, it did so only on due process grounds. Regardless, the *Henne* decision is merely persuasive—not binding—on

WHEREUPON, upon consideration and being duly advised, the Court finds Plaintiffs' motion for summary judgment on the due process claim to be without merit, and it is, therefore DENIED. Accordingly, the Defendants' motion on this issue is GRANTED. Furthermore, the Court finds Plaintiffs' motion for summary judgment on the equal protection claim to be meritorious, and it is, therefore, GRANTED. The Defendants' motion on this issue is DENIED. The Court hereby directs the Defendants to accept the registration of Stephen's birth under the surname Walton, or any other surname designated by his mother, Michelle Brill. Furthermore, the state is hereby enjoined from restricting an unmarried mother's choice of surnames for any child which she is required to register under Ohio Rev.Code § 3705.09(A) and (F).

IT IS SO ORDERED.

this Court. In the Sixth Circuit, this case is one of first impression.