**KINDHEARTS FOR CHARITABLE HUMANITARIAN DEVELOPMENT, INC., Plaintiff**

v.

**Timothy GEITHNER, et al., Defendants.**

**Case No. 3:08CV2400.**

United States District Court, N.D. Ohio, Western Division.

May 10, 2010.

Fritz Byers, Toledo, OH, Alan R. Kabat, Bernabei & Wachtel, David D. Cole, Georgetown University Law Center, Lynne Bernabei, Bernabei & Wachtel, Washington, DC, Alexander A. Abdo, Benjamin E. Wizner, Hina Shamsi, American Civil Liberties Union Foundation, New York, NY, Carrie L. Davis, American Civil Liberties Union of Ohio Foundation, Cleveland, OH, Jeffrey M. Gamso, Gamso, Helmick & Hoolahan, Toledo, OH, for Plaintiff.

Amy E. Powell, Jonathan E. Zimmerman, U.S. Department of Justice—Civ. Division, Federal Programs, Washington, DC, for Defendants.

Daniel J. Maloney, Maloney, McHugh & Kolodgy, Ltd., Toledo, OH, Ranjana Natarajan, University of Texas, School of Law, Austin, TX, for Amicus Curiae.

### ORDER

JAMES G. CARR, Chief Judge.

Plaintiff KindHearts for Charitable Humanitarian Development, Inc. (KindHearts) challenged defendants' block pending investigation (BPI) of KindHearts' assets and provisional determination, by the Office of Foreign Assets Control (OFAC) of the United States Treasury Department, that KindHearts is a Specially Designated Global Terrorist (SDGT).

OFAC's authority to designate SDGTs and block the assets of entities under investigation for supporting terrorism stems from the International Emergency Economic Powers Act (IEEPA), 50 U.S.C. §§ 1701–06, and Executive Order 13224 (E.O. 13224).

On August 18, 2009, I found that in blocking KindHearts' assets, the government violated KindHearts' constitutional and statutory rights. *KindHearts for Charitable Humanitarian Dev., Inc. v.*

*Geithner (KindHearts I)*, 647 F.Supp.2d 857 (N.D.Ohio 2009) (August 18 Order) [Doc. 87]. I found that, in blocking KindHearts' assets, the government: 1) violated KindHearts' Fourth Amendment rights by failing to obtain a warrant based on probable cause; 2) violated KindHearts' Fifth Amendment rights by relying on criteria for the BPI that are unconstitutionally vague as applied, and by failing to provide KindHearts with adequate notice and a meaningful opportunity to respond; and 3) acted arbitrarily and capriciously in limiting KindHearts' access to its own funds to pay counsel for its defense. *Id.* I reserved ruling on the remedies for these violations.

On October 26, 2009, I temporarily restrained OFAC from proceeding with designation of KindHearts as an SDGT pending my determination of the appropriate remedies in this case. *KindHearts for Charitable Humanitarian Dev., Inc. v. Geithner (KindHearts II)*, 676 F.Supp.2d 649 (N.D.Ohio 2009) (October 26 Order) [Doc. 106].

The parties have now fully briefed me on the issue of remedy.

## I. Fourth Amendment Violation

### A. Reasonableness

The government first contends that the Fourth Amendment analysis in my August 18 Order was incomplete. This is so, it argues, because I concluded that OFAC violated KindHearts' Fourth Amendment rights without separately analyzing whether OFAC's seizure of KindHearts' assets was "reasonable."

The government argues that the core of the Fourth Amendment is "reasonableness," and that a seizure may be consistent with the Fourth Amendment if it is rea-

sonable, even if it is not supported by a warrant and probable cause. The government urges me to conclude that under the "totality of the circumstances," the seizure here was reasonable.

As I discussed in my August 18 Order, the government's argument is based on the Fourth Amendment's two textually distinct clauses—one barring "unreasonable searches and seizures," and one stating that "no Warrants shall issue, but upon probable cause." U.S. Const. Amend. IV; *see also KindHearts I, supra,* 647 F.Supp.2d at 878–79.

KindHearts responds that there is no independent "reasonableness" analysis under the Fourth Amendment, and that I already correctly found that the seizure of its assets violated the Fourth Amendment. KindHearts contends that it is well established that the Fourth Amendment requires a warrant and probable cause, or a recognized exception to those requirements.

In my August 18 Order, I first concluded that OFAC's actions amounted to a seizure of KindHearts' assets. *KindHearts I, supra,* 647 F.Supp.2d at 872. I then determined that OFAC's blocking of KindHearts' assets violated the Fourth Amendment because OFAC did not obtain prior judicial review, and neither the special needs nor exigency exception applied. *Id.* at 878–84.[1]

The government's reasonableness argument echoes its prior argument that the BPI falls within the special needs exception to the warrant requirement. The government contends specifically: 1) the government has a strong interest in acting quickly to protect national security; 2) KindHearts' interest is limited; 3) proce-

---

1. The government continues to argue the BPI was not a seizure and that the Fourth Amendment is not implicated here. The government also continues to assert that even if the BPI is a seizure, either the special needs or exigent circumstances exception excuses the warrantless seizure. I decline to revisit my previous ruling rejecting these arguments.

dural safeguards built into the blocking program protect KindHearts' interests; and 4) the specific facts underlying the BPI support a finding of reasonableness.

■ Even assuming *arguendo* that the government is correct that a "reasonable" seizure may comply with the Fourth Amendment absent a warrant and probable cause, or exception thereto, I find the seizure here was not reasonable.

■ In assessing the reasonableness of a seizure, I must weigh the nature and extent of the government's intrusion on private interests, government's interest in effecting the seizure, and the existence of checks on arbitrary executive discretion. *See Samson v. California*, 547 U.S. 843, 856, 126 S.Ct. 2193, 165 L.Ed.2d 250 (2006); *Delaware v. Prouse*, 440 U.S. 648, 654–55, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979); *see also Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 619, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) ("[T]he permissibility of a particular practice is judged by balancing the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." (internal citation and quotation omitted)).

The government argues that its interests here—national security and foreign policy—are "at their zenith." [Doc. 110, at 10]. This is so, the government contends, because BPIs carried out under E.O. 13224 "are by definition conducted to address 'an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States[,]' and are

an exercise of the Executive's authority to act in the foreign policy and national security realm." [*Id.* (quoting E.O. 13224) ].

The government's interest in cutting off funds and other support to terrorism is unquestionably compelling. The other factors, however, demonstrate OFAC's BPI here was not reasonable.[2]

The government continues to argue that it "has a strong interest in being able to act rapidly, sometimes instantaneously, in this area to protect the national security." [*Id.* at 11]. I do not doubt that these interests are strong. I have, however, already held that the government did not demonstrate a need to act rapidly in this case. *KindHearts I, supra*, 647 F.Supp.2d at 883.

KindHearts' interest here is also strong, despite the government's contention that it is "limited." [Doc. 110, at 11]. As KindHearts points out, I previously held that it "had a strong interest in accessing its funds, remaining in operation and disbursing its funds, to the extent it was doing so, lawfully." *KindHearts I, supra*, 647 F.Supp.2d at 884. I remain convinced that KindHearts' interest is substantial.

The government also argues that this was a "regulatory action," not an action carried out "for regular law enforcement purposes." [Doc. 110, at 17]. My prior finding that "OFAC's blocking power has more in common with ordinary law enforcement than with any of the activities considered in the special needs cases" refutes this argument, and I decline the invi-

---

2. The government contends that I should draw on the recent decision of the District of Oregon, *Al Haramain Islamic Foundation, Inc. v. U.S. Dep't of Treasury*, 2009 WL 3756363 (D.Or.) (*Al Haramain*), to conclude that the seizure here was reasonable under the circumstances. I disagree.

First, the court in *Al Haramain* based its conclusion that no Fourth Amendment viola-

tion occurred on the special needs exception, not on a totality of the circumstances reasonableness analysis. I already concluded, and decline to revisit, my previous conclusion that the special needs exception is inapplicable here. Second, I find the Oregon court's balancing between the individual and governmental interests unpersuasive as applied to the facts of this case.

tation to revisit it. *KindHearts I, supra,* 647 F.Supp.2d at 881.

Next, the government contends that the facts underlying the BPI require a finding of reasonableness. While these facts may speak to the level of governmental interest at stake—one which I agree is compelling—the seriousness of the actions OFAC attributes to KindHearts does not itself make a search reasonable.

The government argues that "this case involves not the search of a home, but the regulatory blocking of the assets of an organization. The blocking does not involve a search ... and as a result, Plaintiff's privacy interests are substantially lower than those of the typical criminal defendant whose home was searched." [Doc. 110, at 16–17]. I disagree.

The intrusion in this case is far different in time and scope than those upheld as "reasonable" in the cases the government cites. For example, in upholding a police officer's authority to order a driver out of his car at a traffic stop, the Supreme Court noted that the intrusion on the driver's liberty "can only be described as *de minimis*" and as "at most a mere inconvenience." *Pennsylvania v. Mimms,* 434 U.S. 106, 111, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977).

In *U.S. v. Knights,* 534 U.S. 112, 118, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001), the Court upheld as "reasonable" a warrantless search of a probationer's apartment. The Court noted, however, a probationer's "significantly diminished privacy interests." *Id.* at 121, 122 S.Ct. 587.

Similarly, in *U.S. v. Conley,* 453 F.3d 674, 680–81 (6th Cir.2006), the Sixth Circuit held that collection of DNA from a parolee did not violate the Fourth Amendment. The court in *Conley* relied on a parolee's "sharply reduced expectation of privacy" and the "minimal intrusion required in taking a blood sample." *Id.* at 680.

The duration of the intrusion on private interests here is far more extensive than the "mere inconvenience" in *Mimms, supra,* 434 U.S. at 111, 98 S.Ct. 330, or the "minimal intrusion" in *Conley, supra,* 453 F.3d at 680. OFAC froze all of KindHearts' assets in February, 2006, and they have remained frozen ever since. A block affects "all property" in the control of a target entity, presently, and in the future. E.O. 13224 § 1. A block can thus last indefinitely.

Unlike the probationer in *Knights* and the parolee in *Conley,* KindHearts' expectation of privacy was not diminished. The intrusion here—seizing all of KindHearts assets for an indefinite period of time—is a far more substantial intrusion on private interests than those upheld as "reasonable" in those cases.

■ I may consider procedural safeguards in determining whether a seizure is reasonable. *Cf. Samson, supra,* 547 U.S. at 856, 126 S.Ct. 2193 (noting that prohibition on "arbitrary, capricious or harassing searches" provided a check on officer's discretion in searching a parolee); *Marshall v. Barlow's, Inc.,* 436 U.S. 307, 323, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978) (invalidating statute authorizing administrative searches that "devolve[d] almost unbridled discretion upon executive and administrative officers, particularly those in the field, as to when to search and who to search").

■ The government argues that internal procedural safeguards protect KindHearts' interests: 1) "blockings are carried out only as authorized by Congress following a presidential declaration of a national emergency"; 2) "[d]esignations pursuant to E.O. 13,224 require extensive internal process and consultation with the Secretary of State and the Attorney General on the basis of an administrative record"; and 3) "blockings are carried out only following substantial investigations into the designated party's actions and a consideration

of the evidence obtained." [Doc. 110, at 17].

I find these internal protections insufficient to satisfy the concerns underlying the Fourth Amendment. As I noted in the special needs analysis of my August 18 Order, "OFAC's blocking power entails no built-in limitation curtailing executive discretion and putting individuals on notice that they are subject to blocking." *KindHearts I, supra,* 647 F.Supp.2d at 857.

■ The government lastly argues that, under the Administrative Procedure Act (APA), 5 U.S.C. § 701 *et seq.,* a blocked party can obtain post-blocking judicial review. The availability of after-the-fact judicial review cannot alone, however, make a seizure reasonable. *Cf. U.S. v. U.S. District Court,* 407 U.S. 297, 317–18, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972) ("The independent check upon executive discretion is not satisfied, as the Government argues, by 'extremely limited' post-surveillance judicial review."). As KindHearts points out, courts have not held that the availability of a cause of action under 42 U.S.C. § 1983 or *Bivens v. Six Unknown Fed. Narcotics Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), for a Fourth Amendment violation somehow makes a seizure reasonable.

OFAC need only claim that it is "investigating" a target entity to seize all of its assets. *See* 50 U.S.C. § 1702; E.O. 13224 § 1. Neither IEEPA nor E.O. 13224 places any substantive limits on this power to seize. OFAC has broad power to block any and all assets of an entity subject to United States jurisdiction at any time, for any amount of time, and on virtually any level of suspicion.

■ Given the substantial intrusion on KindHearts' interest, the seizure here was not reasonable under the Fourth Amendment based on the totality of the circumstances.[3]

## B. Remedy for Fourth Amendment Violation

Having concluded that the BPI was not otherwise reasonable and thus violated the Fourth Amendment, I am left with the difficult task of constructing an appropriate remedy for that violation. In so doing, I am cognizant that I stand at the intersection of Article II, with its absolute delegation of authority to the President to conduct our foreign affairs and keep us secure from foreign-based dangers, and the judicial authority and duty under Article III to enforce constitutional rights and protect those rights from infringement.

KindHearts argues that the only available remedy is invalidation of the BPI and return of its funds. KindHearts argues this is so because: 1) the APA requires it; and 2) I lack authority to construct any other remedy.

■ The government argues that, should I conclude—as I have—that the BPI was not otherwise reasonable, I should conduct a post-seizure probable cause review.[4]

---

3. I note that, even assuming *arguendo* that the seizure was reasonable at the time, it became unreasonable given the duration and scope of the seizure and KindHearts' inability to challenge it. *Cf. Terry v. Ohio,* 392 U.S. 1, 17–18, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) ("A search which is reasonable at its inception may violate the Fourth Amendment by virtue of its intolerable intensity and scope.").

4. The government alternatively argues that I could apply the traditional Fourth Amendment remedy here—suppression—by ordering exclusion of any evidence obtained as a result of the seizure from any criminal proceeding.

In the well established criminal search and seizure context, the typical remedy for a Fourth Amendment violation is suppression at trial of the illegally seized evidence. *E.g., U.S. v. Nichols,* 512 F.3d 789, 794 (6th Cir. 2008) (noting that suppression is the "tradi-

■ I note at the outset that I recognize the Fourth Amendment's scope is more limited in the context of foreign relations and national security than in typical domestic criminal investigations and administrative actions. Other courts have recognized that the Constitution has different limits when it implicates foreign policy or national security. *See Regan v. Wald,* 468 U.S. 222, 241–42, 104 S.Ct. 3026, 82 L.Ed.2d 171 (1984) (upholding Cuban travel restrictions against a Fifth Amendment challenge and noting that "the Fifth Amendment right to travel, standing alone [was] insufficient to overcome the foreign policy justifications supporting the restriction"); *Freedom to Travel Campaign v. Newcomb,* 82 F.3d 1431, 1438–40 (9th Cir. 1996) (noting that while freedom to travel internationally is a liberty interest recognized by the Fifth Amendment, restrictions on international travel are "usually granted much greater deference" and viewed "through a less critical lens" than domestic travel); *Capital Cities/ABC, Inc. v. Brady,* 740 F.Supp. 1007, 1012–13 (S.D.N.Y.1990) (stating that First Amendment limitations are weaker in the foreign affairs context than in the domestic context).

■ The Executive Branch has broad discretion in foreign affairs and national security. *See Dep't of Navy v. Egan,* 484 U.S. 518, 529–30, 108 S.Ct. 818, 98 L.Ed.2d 918 (1988) ("The Court also has recognized the generally accepted view that foreign policy was the province and responsibility of the Executive.... [C]ourts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs." (internal citations and quotations omitted)); *Chicago &*

S. *Air Lines v. Waterman S.S. Corp.,* 333 U.S. 103, 111, 68 S.Ct. 431, 92 L.Ed. 568 (1948) ("[T]he very nature of executive decisions as to foreign policy is political, not judicial.... They are delicate, complex, and involve large elements of prophecy.... They are decisions of a kind for which the Judiciary has neither aptitude, facilities nor ˙ responsibility[.]"); *U.S. v. Smith,* 899 F.2d 564, 569 (6th Cir.1990) (noting the "broad authority of the Executive Branch to exercise its discretion in matters that touch national security and foreign affairs").

■ It is the role of the judiciary, however, to ensure the protection of individual rights. *E.g., Trop v. Dulles,* 356 U.S. 86, 103, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958) ("The Judiciary has the duty of implementing the constitutional safeguards that protect individual rights. When the Government acts to take away [fundamental rights] ..., the safeguards of the Constitution should be examined with special diligence."); *accord Brill v. Hedges,* 783 F.Supp. 340, 346 (S.D.Ohio 1991) ("[T]he judiciary's role [is to ˙serve] as a protector of individual rights and freedoms.").

This is true in even the most dire of circumstances. *See Hamdi v. Rumsfeld,* 542 U.S. 507, 536, 124 S.Ct. 2633, 159 L.Ed.2d 578 (2004) (plurality opinion) ("We have long since made clear that a state of war is not a blank check for the President when it comes to the rights of the Nation's citizens."); *see also Home Bldg. & Loan Ass'n v. Blaisdell,* 290 U.S. 398, 426, 54 S.Ct. 231, 78 L.Ed. 413 (1934) (holding that "even the war power does not remove constitutional limitations safeguarding essential liberties").

tional remedy" for Fourth Amendment violations).

This traditional remedy does not, however, fit the circumstances of this case. The seizure at issue here involved freezing all of KindH-

earts' funds. Suppressing the use of the funds in potential future criminal proceedings would not provide an adequate remedy to KindHearts.

This tension between assuring security and protecting liberty is never-ending, and has been present since the founding of our Republic: "Emergency does not increase granted power or remove or diminish the restrictions imposed upon power granted or reserved. The Constitution was adopted in a period of grave emergency." *Blaisdell, supra,* 290 U.S. at 425, 54 S.Ct. 231. The Supreme Court, moreover, has stated:

> The provisions of the Constitution are not time-worn adages or hollow shibboleths. They are vital, living principles that authorize and limit governmental powers in our Nation. They are the rules of government. When the constitutionality of an Act of Congress [or executive action thereunder] is challenged in this Court, we must apply those rules. If we do not, the words of the Constitution become little more than good advice.
>
> When it appears that an Act of Congress [or executive action] conflicts with one of these provisions, we have no choice but to enforce the paramount commands of the Constitution. We are sworn to do no less. We cannot push back the limits of the Constitution merely to accommodate challenged legislation. We must apply those limits as the Constitution prescribes them, bearing in mind both the broad scope of legislative discretion and the ultimate responsibility of constitutional adjudication. We do well to approach this task cautiously, as all our predecessors have counseled. But the ordeal of judgment cannot be shirked.

*Trop, supra,* 356 U.S. at 103–04, 78 S.Ct. 590.

I "must be careful to balance" the Fourth Amendment "constitutional issues that could arise from deference to the agency's interpretation against those constitutional issues which may arise if insufficient latitude is given to the executive in the conduct of foreign affairs." *Capital Cities, supra,* 740 F.Supp. at 1013. Mindful of the need to attain such balance, I turn to the question of remedy.

### 1. Post–Hoc Probable Cause Showing

Analogizing to exigent circumstances and forfeiture cases, the government argues that a post-hoc probable cause determination can cure the Fourth Amendment violation.

KindHearts argues such review is inappropriate because: 1) I do not have authority to issue a warrant; 2) a warrant cannot issue after a seizure; 3) post-seizure review in the Fourth Amendment context is limited to situations where an exception to the warrant requirement applies; and 4) neither I nor Congress have formulated an appropriate probable cause standard for BPIs.

I agree with the government that, under the unique circumstances of this case, I can and should implement post-hoc probable cause review.

### a. Authority to Order Post–Hoc Probable Cause Showing

■ KindHearts argues, specifically, that a warrant cannot issue post-seizure, and that I "lack[ ] authority to issue a warrant under OFAC's BPI scheme." [Doc. 112, at 15]. In so arguing, KindHearts relies on the Sixth Circuit's decision in *U.S. v. Finazzo,* 583 F.2d 837, 844 (6th Cir.1978), *vacated on other grounds,* 441 U.S. 929, 99 S.Ct. 2047, 60 L.Ed.2d 657 (1979).

■ Courts have broad equitable power to fashion appropriate remedies for adjudicated constitutional and statutory violations. *See, e.g., Swann v. Charlotte–Mecklenburg Bd. of Educ.,* 402 U.S. 1, 15–16, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971) ("Once a right and a violation have been shown, the scope of a district court's equi-

table powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies."); *Carter–Jones Lumber Co. v. Dixie Distrib. Co.,* 166 F.3d 840, 846 (6th Cir.1999) ("[A] court of equity has traditionally had the power to fashion any remedy deemed necessary and appropriate to do justice in a particular case."). In determining "how far this remedial power extends[,] it is important to remember that judicial powers may be exercised only on the basis of a constitutional violation" and "the nature of the violation determines the scope of the remedy." *Swann, supra,* 402 U.S. at 15, 91 S.Ct. 1267.

KindHearts argues that I do not have authority to remedy the Fourth Amendment violation because I have no inherent authority to issue a warrant. In *Finazzo,* the Sixth Circuit addressed whether a wiretapping statute authorized FBI agents to "secret[ly] ent[er]" an office to install eavesdropping devices. 583 F.2d at 839–42. After holding that the statute did not authorize the action, the court went on to hold: "[F]ederal judicial officers do not possess an inherent power to issue search warrants or inherent power in the absence of statute to authorize law enforcement officers to engage in break-ins in the execution of search warrants." *Id.* at 844.[5]

As discussed below, in ordering a probable cause showing, I am not issuing a "retroactive warrant" as KindHearts contends. Rather, I am ordering a probable cause showing as a remedy for the warrantless seizure and prolonged and continuing retention of KindHearts' assets.

I thus find that it is within the scope of my power to remedy constitutional violations to order this post-hoc probable cause showing. I recognize that this is an unusual and atypical remedy, but this is an unusual and atypical situation.

### b. Post–Seizure Review

██ I find the analogy the government draws to forfeiture law instructive. Civil forfeiture implicates both the Fourth and Fifth Amendments. *See U.S. v. James Daniel Good Real Prop. (James Daniel Good),* 510 U.S. 43, 48–49, 114 S.Ct. 492, 126 L.Ed.2d 490 (1993) (holding that both Fourth Amendment warrant and probable cause and Fifth Amendment due process requirements apply to civil forfeiture proceedings); *see also One 1958 Plymouth Sedan v. Pennsylvania,* 380 U.S. 693, 696, 700, 85 S.Ct. 1246, 14 L.Ed.2d 170 (1965) (holding that exclusionary rule applies to civil forfeiture proceedings).

Courts have held that in forfeiture proceedings due process requires the govern-

---

**5.** The Supreme Court vacated *Finazzo* in light of the holding in *Dalia v. U.S.,* 441 U.S. 238, 252–54, 99 S.Ct. 1682, 60 L.Ed.2d 177 (1979), that Congress intended to authorize covert entry to install the eavesdropping devices. This was so, because in part, Congress' purpose in enacting the statute would be "largely thwarted" if the statute were read to permit electronic bugging, but not the means to install the bugs. *Id.* at 252, 99 S.Ct. 1682.

The government points out that the Seventh Circuit expressly disagreed with *Finazzo* in *U.S. v. Torres,* 751 F.2d 875, 880 (7th Cir. 1985). The court in *Torres* rejected the plaintiff's argument that because neither Title III nor Rule 41 explicitly authorize closed circuit television surveillance, no court has the au-

thority to issue a warrant to conduct such surveillance. The court held: "[T]he power to issue a search warrant was historically, and is still today, an inherent (by which we mean simply a nonstatutory, or common law) power of a court of general jurisdiction." *Id.* at 878.

Other courts have likewise held that a court has inherent authority to issue a warrant. *See, e.g., U.S. v. Falls,* 34 F.3d 674, 678 (8th Cir.1994); *U.S. v. Villegas,* 899 F.2d 1324, 1334 (2d Cir.1990).

*Finazzo's* holding that courts lack inherent power to issue warrants, however, is still good law in the Sixth Circuit. I am not, however, issuing a warrant in this case, so *Finazzo* is not controlling.

ment to provide notice and a hearing prior to seizing real property absent exigent circumstances. *James Daniel Good, supra,* 510 U.S. at 59, 114 S.Ct. 492.

▮ If, however, the government fails to provide such pre-deprivation process, it is not required to release the forfeited property if, following the seizure, it can show probable cause that the seized assets are subject to forfeiture. *See U.S. v. Real Prop. Located at 1184 Drycreek Road,* 174 F.3d 720, 727 (6th Cir.1999); *accord U.S. v. Bowman,* 341 F.3d 1228, 1235–36 (11th Cir.2003) ("It would not be appropriate to return real property to the property owner if the Government can establish at the post-seizure adversarial hearing (as it has in this case) that there is probable cause to believe that the property is connected to criminal activity. The effect of returning the property to the property owner under these circumstances would be to allow the continuation of illegal activity, an outcome Congress surely did not intend.").

▮ The Sixth Circuit rejected a forfeiture plaintiff's argument that the due process violation required the forfeiture be set aside and the civil forfeiture case be dismissed. *Drycreek Road, supra,* 174 F.3d at 727–28. Rather, the court, agreeing with the majority of circuits, held that where "the property is found to be subject to forfeiture after the process due has been afforded, the violation does not immunize the property from forfeiture." *Id.* at 728.[6] If, therefore, the government can show probable cause to believe the property is subject to forfeiture, it can retain the property.

While KindHearts is correct that these cases address remedies for Fifth Amendment—not Fourth Amendment—violations, and that these cases involve prior

warrants, the parallels to the seizure here are apparent. As with civil forfeiture, the action challenged here is a seizure of KindHearts' assets authorized by a particular statute. Both are civil in nature, but both serve law-enforcement-like purposes, *see James Daniel Good, supra,* 510 U.S. at 48, 114 S.Ct. 492; *KindHearts I, supra,* 647 F.Supp.2d at 881, and implicate intertwined Fourth and Fifth Amendment concerns.

Although the forfeiture analogy is imperfect, it does demonstrate the potential inappropriateness of returning seized assets when the government can show post-seizure probable cause for the seizure. I thus find that ordering return of KindHearts' assets would be similarly inappropriate if the government can show probable cause. This is especially true in this situation, where whatever I do intrudes—or risks intruding—into the zone of authority secured to the Executive under Article II.

### c. Probable Cause Standard

As the parties point out, my August 18 Order did not delineate the level of probable cause that must be shown in the context of a BPI carried out under IEEPA.

In the criminal context, the Supreme Court has stated that "[t]he probable cause standard is incapable of precise definition or quantification," but has described the standard as "a reasonable ground for belief of guilt and that the belief of guilt must be particularized with respect to the person to be searched or seized." *Maryland v. Pringle,* 540 U.S. 366, 371, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003) (internal quotations and citations omitted). It is a "fluid concept[ ] that take[s] [its] substantive content from the particular context[ ] in which the standard[ ][is] being as-

---

6. The government is, however, responsible for rents and profits of which a claimant is deprived during the period of illegal seizure if there are no exigent circumstances. *Drycreek Road, supra,* 174 F.3d at 728.

sessed." *Ornelas v. U.S.*, 517 U.S. 690, 696, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996).

In the administrative search context, the Supreme Court has explained that "where considerations of health and safety are involved, the facts that would justify an inference of 'probable cause' to make an inspection are clearly different from those that would justify such an inference where a criminal investigation has been undertaken." *Camara v. Municipal Court*, 387 U.S. 523, 538, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967).

The court in *Camara* examined the level of probable cause necessary to issue a warrant for building inspections by municipal health and safety officials. It concluded that there is "probable cause" to issue a warrant "if reasonable legislative or administrative standards for conducting an area inspection are satisfied with respect to a particular dwelling." *Id.*

█ "The test of 'probable cause' required by the Fourth Amendment can take into account the nature of the search that is being sought." *Id.* (citing *Frank v. Maryland*, 359 U.S. 360, 383, 79 S.Ct. 804, 3 L.Ed.2d 877 (1959) (Douglas, J., dissenting)).

█ In *U.S. District Court, supra*, 407 U.S. at 307–08, 92 S.Ct. 2125, the Supreme Court held that Title III of the Omnibus Crime Control and Safe Streets Act, 18 U.S.C. §§ 2510–20, did not grant the President authority to conduct warrantless electronic surveillance in matters affecting domestic security. The Court then addressed what restrictions the Fourth Amendment places on the President's authority.

Although the Court left determination of the exact procedures up to Congress,[7] it acknowledged that different standards for issuing warrants, and, as well, the type of suspicion constituting probable cause, may exist for the conventional criminal search warrant, on the one hand, and secret surveillance undertaken to protect against foreign dangers, on the other:

> We recognize that domestic security surveillance may involve different policy and practical considerations from the surveillance of 'ordinary crime.' ... Often, too, the emphasis of domestic intelligence gathering is on the prevention of unlawful activity or the enhancement of the Government's preparedness for some possible future crisis or emergency. Thus, the focus of domestic surveillance may be less precise than that directed against more conventional types of crime.

> Given those potential distinctions between Title III criminal surveillances and those involving the domestic security, Congress may wish to consider protective standards for the latter which differ from those already prescribed for specified crimes in Title III. Different standards may be compatible with the Fourth Amendment if they are reasonable both in relation to the legitimate need of Government for intelligence information and the protected rights of our citizens. For the warrant application may vary according to the governmental interest to be enforced and the

---

7. Like the Supreme Court in *U.S. District Court, supra*, 407 U.S. at 320, 92 S.Ct. 2125, I leave to Congress "the responsibility for considering and adopting the appropriate structure" for pre-blocking warrant and probable cause standards that would comply with the Fourth Amendment. *KindHearts I, supra*, 647 F.Supp.2d at 885. Here, however, I am not delineating pre-seizure requirements; I am, rather, constructing a remedy for the constitutional violation in this case.

nature of citizen rights deserving protection.

*Id.* at 332–33, 92 S.Ct. 2125.

Under the Foreign Intelligence Surveillance Act (FISA), passed by Congress in response to the *U.S. District Court* decision, a federal officer must have "probable cause to believe that . . . the target of the electronic surveillance is a foreign power or agent of a foreign power," and that "each of the facilities or places at which the surveillance is directed is being used, or is about to be used, by a foreign power or agent of a foreign power." 50 U.S.C. § 1804(a)(7)(A)-(B). Courts have upheld this modified probable cause standard under the Fourth Amendment. *See, e.g., U.S. v. Johnson,* 952 F.2d 565, 573 (1st Cir.1991); *U.S. v. Pelton,* 835 F.2d 1067, 1075 (4th Cir.1987); *U.S. v. Badia,* 827 F.2d 1458, 1464 (11th Cir.1987).

As I held in my August 18 Order:

Here, as well, in view of the effect of implementation of Fourth Amendment protections and processes on the President's Article II powers, some reformulation of the probable cause requirement may be appropriate. The same may be true with regard to variance from the conventional process for obtaining judicial warrants under the Fourth Amendment and Rule 41 of the Federal Rules of Civil Procedure.

*KindHearts I, supra,* 647 F.Supp.2d at 884.

As the Supreme Court recognized in *Camara* and *U.S. District Court,* probable cause standards, therefore, may vary depending on the context. This is not a conventional criminal case, and thus the typical Fourth Amendment probable cause standard is inapplicable. I therefore find that, given the unique circumstances of this case, the content of the probable cause showing differs from the formulation applicable to a search warrant sought in conjunction with a criminal investigation. *See Camara, supra,* 387 U.S. at 538, 87 S.Ct. 1727; *U.S. District Court, supra,* 407 U.S. at 332–33, 92 S.Ct. 2125.

I conclude that the government need not show probable cause to believe that evidence of a crime will be found. The government must instead show that, at the time of the original seizure, it had probable cause—that is, a reasonable ground—to believe that KindHearts, specifically, was subject to designation under E.O. 13224 § 1.

■■■ I further find that if the government can show probable cause for the original seizure, even at this very late date, the post-hoc judicial finding of such cause remedies the Fourth Amendment violation.[8]

---

**8.** The October, 2001, Patriot Act amended IEEPA. The amendment permitted the Treasury Secretary to impose on an entity all the blocking effects of a designation, including freezing an organization's assets indefinitely, without designating the organization as an SGDT. 50 U.S.C. § 1702(a)(1)(B). The amendment also provided, *inter alia:*

(c) **Classified information.**—In any judicial review of a determination made under this section, if the determination was based on classified information (as defined in section 1(a) of the Classified Information Procedures Act) such information may be submitted to the reviewing court ex parte and in camera. This subsection does not confer or imply any right to judicial review.

*Id.* § 1702(c).

It is thus appropriate—should the government request my review of classified information in making its probable cause showing—for me to hold this probable cause hearing *ex parte* and *in camera.*

For now I do not consider, much less try to spell out, what further remedy would be appropriate and necessary if the government fails to show probable cause as provided herein.

While it would have been easier for all involved if OFAC had obtained independent judicial review and a warrant prior to seizing KindHearts' assets, or if it had provided KindHearts with a prompt and meaningful way to challenge the seizure, I find that this post-hoc probable cause determination, though not typical, provides a necessary check on otherwise unrestrained executive discretion. This is particularly so in these specific circumstances, where that discretion has been used in a way that violates the Constitution.

### 2. APA

██ KindHearts argues that the 5 U.S.C. § 706(2)(B) requires that I invalidate the BPI. The APA states that a reviewing court "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . contrary to a constitutional right." *Id.*

The APA also instructs reviewing courts to take "due account . . . of the rule of prejudicial error." *Id.* § 706.[9] Thus, harmless errors in agency action need not be set aside. *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 659, 127 S.Ct. 2518, 168 L.Ed.2d 467 (2007).

If the government shows probable cause for the seizure, even at this very late date, then the Fourth Amendment violation will be remedied and thus harmless, and the government can retain the plaintiff's assets pending completion of the administrative SDGT process.

### II. Fifth Amendment Violations

### A. Vagueness Violation

In my August 18 Order, I held: "In this case, OFAC failed to follow the Fourth Amendment in imposing the [BPI]. Thus,

as applied to KindHearts, OFAC's authority under the IEEPA and E.O. 13224 was unconstitutionally vague." *KindHearts I, supra,* 647 F.Supp.2d at 893 n. 15.

Because I above order the government to show probable cause, I withhold judgment on this violation's remedy until that showing.

### B. Inadequate Notice & Meaningful Opportunity to Respond Violations

In my August 18 Order, I held that the government's "blocking order failed to provide [KindHearts with] the two fundamental requirements of due process: meaningful notice and [an] opportunity to be heard." *KindHearts I, supra,* 647 F.Supp.2d at 897 (citing *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)). I do not here revisit that determination, but I must decide what remedy flows from these violations of the Fifth Amendment's Due Process Clause.

### 1. Structural or Harmless Error Analysis

KindHearts argues that this violation is a "structural error," the sort of error which is "so fundamental that [it] def[ies] harmless-error analysis and warrant[s] automatic reversal" of the unconstitutional government action. [Doc. 107, at 26].

The government claims that I should examine the due process violations here under harmless error analysis, because "[d]ue process errors in administrative proceedings are routinely subject to harmless error analysis." [Doc. 110, at 35].

██ Structural errors typically arise in the context of criminal trials. A structural error is "a defect affecting the framework

---

**9.** KindHearts also contends that even if I invalidate the BPI, the government would be able to adequately protect its interests through other statutes, including the Civil Asset Forfeiture Reform Act, 18 U.S.C. §§ 981–

87, or those prohibiting material support of terrorism, e.g., 18 U.S.C. § 2339A–B. Because I find that the constitutional violation can be remedied adequately as discussed above, I need not reach this argument.

within which the trial proceeds, rather than simply an error in the trial process itself." *Neder v. U.S.,* 527 U.S. 1, 8, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999) (internal citation omitted). Because they "deprive defendants of basic protections without which a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence," structural errors *per se* require setting aside the entire proceeding. *Id.* at 8–9, 119 S.Ct. 1827.

■ By contrast, trial-type errors are subject to harmless error analysis, because they "may be quantitatively assessed in the context of other evidence presented ... to determine" the effect of the error. *Arizona v. Fulminante,* 499 U.S. 279, 307–08, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). Judicial review of agency action under the APA, moreover, contemplates a harmless error analysis. 5 U.S.C. § 706 ("[A] court shall review the whole record ... and due account shall be taken of the rule of prejudicial error."); *see also Shinseki v. Sanders,* ── U.S. ──, 129 S.Ct. 1696, 1704, 173 L.Ed.2d 532 (2009) (noting that "the APA's reference to 'prejudicial error' is intended to sum up in succinct fashion the 'harmless error' rule" (internal quotation and citation omitted)).

■ An analogy may assist to clarify the distinction between structural errors and those amenable to harmless error analysis. If the proceedings before OFAC were a house, and termites represented OFAC's constitutional violations, the question of whether the violations rise to the "structural" level is whether the termites' damage to the structural integrity of the house is so significant as to require demolishing and completely rebuilding the house, or whether repairs can return the house to a safe and stable condition. In other words, I must determine whether what was done was irreparably destructive, or simply damaging, even seriously damaging.

Here, repair is possible. OFAC's failure to provide KindHearts with constitutionally adequate notice or a meaningful opportunity to respond was not so serious as to "affect[ ] the framework in which" the BPI proceeds. *Neder, supra,* 527 U.S. at 8, 119 S.Ct. 1827. This is so largely because I have stayed further designation proceedings until I remedy these constitutional violations. *See KindHearts II, supra,* 676 F.Supp.2d at 656–57. Were KindHearts required to continue to navigate the complex designation process with constitutionally inadequate notice, such constitutional error might require a different conclusion. That is, though, not so here. The inadequate notice has not yet eaten away at the structural underpinnings of OFAC's designation process vis-a-vis KindHearts.

I therefore apply harmless error analysis to OFAC's notice and opportunity-to-respond violations.

### 2. Harmless Error Analysis

I must now determine whether those violations are harmless.

#### a. Burden of Proof

■ KindHearts argues that harmless error analysis requires the government to show its constitutional violations were "harmless beyond a reasonable doubt." *Tenn. Secondary Sch. Athletic Ass'n v. Brentwood Acad.,* 551 U.S. 291, 303, 127 S.Ct. 2489, 168 L.Ed.2d 166 (2007). The government disagrees: "Plaintiff cannot show that the error at issue would have altered the outcome of the decision ... [and] mischaracterizes the harmless error standard when it quotes language from *Brentwood Academy* [.] ... [T]he subsequent *Shinseki v. Sanders* opinion [explains that] the government [has] to prove due process errors harmless only in criminal cases." [Doc. 110, at 27].

In *Brentwood Academy,* the Supreme Court held that the government has the burden to show "beyond a reasonable doubt" that its *constitutional* errors did

not prejudice a private individual's administrative proceedings. 551 U.S. at 303–04, 127 S.Ct. 2489.

In *Shinseki,* the Court held that an applicant for disability benefits has the burden to show—by a preponderance of the evidence—that *statutory* notice errors are not harmless. 129 S.Ct. at 1704–06. The Court rested its position in part on the better position of the applicant to explain his disability, *id.* at 1705, and then explained further:

> Lower court cases make clear that courts have correlated review of ordinary administrative proceedings to appellate review of civil cases in this respect. Consequently, the burden of showing that an error is harmful normally falls upon the party attacking the agency's determination.... The party seeking to reverse the result of a civil proceeding will likely be in a position at least as good as, and often better than, the opposing party to explain he has been hurt by an error.

*Id.* at 1706.

In rejecting placing the burden on the agency, the Court explained:

> [W]e have placed such a burden on [the agency] only when the matter underlying review was criminal.... In criminal cases the Government seeks to deprive an individual of his liberty, thereby providing a good reason to require the Gov-

ernment to explain why an error should not upset the trial court's determination. And the fact that the Government must prove its case beyond a reasonable doubt justifies a rule that makes it more difficult for the reviewing court to find that an error did not affect the outcome of a case.... But *in the ordinary civil case* that is not so.

*Id.* (emphasis added).

It is important to note, initially, that *Shinseki* did not purport to overrule (nor even mentioned) *Brentwood Academy,* notwithstanding the closeness in time and subject matter of the two opinions. While the language of the two decisions, moreover, may seem difficult to reconcile, the distinct contexts—*Brentwood Academy* involved constitutional violations, and *Shinseki* involved statutory ones—distinguish the cases.

Because the case before me involves constitutional violations, I find the *Brentwood Academy* burden of proof applicable.[10] *See also Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) ("Certainly error, constitutional error, in illegally admitting highly prejudicial evidence or comments, casts on someone other than the person prejudiced by it a burden to show that it was harmless. It is for that reason that the original common-law harmless-error rule put the burden on the beneficiary of the error either to prove that there was no injury or to

---

10. Even were *Shinseki* to apply generally to constitutional violations also, its language and logic do not apply here. This case does not resemble an "ordinary civil case"; it instead is more akin to a criminal investigation and prosecution. This is so because it involves suspicion of illegal activity, Fourth Amendment search and seizure, and an entity at risk of losing its very existence. *Cf. KindHearts I, supra,* 647 F.Supp.2d at 881 (detailing how the designation process resembles law enforcement, not administrative, action). I also note that KindHearts may be the subject of an actual criminal prosecution, as evidenced by the government's execution of search warrants at its offices and the home of its principal officer.

The government, moreover, is better positioned than KindHearts to explain the nature of the error, because it knows the factual and legal foundations of its actions. Requiring KindHearts to show the constitutionally inadequate notice was not harmless would be requiring KindHearts to "disprove a negative." *KindHearts II, supra,* 676 F.Supp.2d at 653. I decline to do so, and *Shinseki* does not compel otherwise.

suffer a reversal of his erroneously obtained judgment."); *Al Haramain, supra,* 2009 WL 3756363, *7 (requiring the government to show, in the context of designation proceedings, that any constitutional errors were harmless beyond a reasonable doubt).

The government therefore must persuade me that its Fifth Amendment violations are harmless beyond a reasonable doubt.

### b. OFAC's Due Process Violations Are Not Harmless

The government argues: 1) "[t]he most logical way to conduct harmless error analysis is to allow the current proceeding [presumably designation] to progress to a final conclusion" [Doc. 110, at 29]; 2) "[p]laintiff has now received all notice to which it is due and has been invited to respond to that notice" [*Id.*]; and 3) "[n]o amount of additional notice would have changed the[ ] facts" justifying the BPI [Doc. 113, at 35].

KindHearts responds: 1) permitting OFAC "to proceed with designation before it has cured the [due process] defects in its BPI process would be to deny KindHearts the constitutional BPI process to which it is entitled[,]" and "would risk irreparable injury and undermine the Court's ability to provide a meaningful remedy for the BPI violations" [Doc. 112, at 29, 33]; 2) I already held OFAC's notice to be constitutionally inadequate so far; and 3) "had

OFAC provided KindHearts adequate notice and a meaningful opportunity to defend itself, KindHearts would have responded to the actual bases for the freeze, not to vague and general assertions," [Doc. 107, at 29] and "OFAC has made no . . . showing" to the contrary [Doc. 112, at 33].

■ As to the government's first argument, the government concedes that the BPI constitutes final agency action. [Doc. 113, at 26 ("To clarify, the BPI and any decision resulting from the designation proceeding are two separate and final agency actions.")]. Each final agency action merits its own review, 5 U.S.C. § 706, including determination of what remedy should issue for OFAC's constitutional violations; I held as much in my October 26 Order, and I decline to short-circuit that process now. *See KindHearts II, supra,* 676 F.Supp.2d at 651.

As to the government's second argument, the government continues to emphasize that "KindHearts possesses ample notice of the allegations supporting a BPI." [Doc. 110, at 30].[11] I have, however, already stated that these items provide KindHearts with a "scanty" and "largely uninformative" explanation for the BPI. *KindHearts I, supra,* 647 F.Supp.2d at 905, 907. This led me to conclude that "KindHearts remains largely uninformed about the basis for the government's actions," *id.* at 904, and that OFAC therefore "violated KindHearts' fundamental right to

---

11. The government lists the items it claims provided KindHearts with notice:
 (1) the notice of the BPI and the simultaneously-issued public notice summarizing the evidentiary basis therefore; (2) the unclassified, non-privileged administrative records for both the BPI and the provisional designation determination, including unclassified, nonprivileged versions of the memoranda in support of the BPI and the provisional determination; (3) all materials declassified in response to Plaintiff's request; and (4) all additional unclassified,

nonprivileged, evidence that the agency is currently considering. . . . Additional notice, not yet acknowledged by the Court, but relevant to final decision is that KindHearts is in possession of hundreds of pages of briefing and several hours of oral argument in which undersigned counsel described in detail the unclassified, non-privileged evidence supporting designation and explained the reasoning supporting both the BPI and the ongoing process.
[Doc. 110, at 30].

be told on what basis and for what reasons the government deprived it of all access to its assets and shut down its operations," *id.* at 906. I thus found the notice OFAC provided KindHearts constitutionally inadequate,[12] and I decline to revisit that holding now.[13]

■■■ As to the government's third argument, the government fails to show that KindHearts could submit nothing that would adequately address the agency's concerns. Harmless errors are those "small errors or defects that have little, if any, likelihood of having changed the result of the trial." *Chapman, supra,* 386 U.S. at 22, 87 S.Ct. 824.

Here, KindHearts still does not know what facts to rebut, or what other grounds the government has for its action. As KindHearts points out, "OFAC has yet to afford KindHearts constitutionally adequate notice of the charges against it that would allow KindHearts to know what to look for" in its documents. [Doc. 112, at 39 n. 16].

Demonstrating that OFAC's error is harmless thus requires the government to prove *beyond a reasonable doubt* that KindHearts could marshal no evidence to rebut still unknown factual and legal reasons for the government's action. The government has not met its burden, instead focusing its argument on the adequacy of the "notice" provided thus far.

The government's failure to provide KindHearts with adequate notice and a meaningful opportunity to respond was, therefore, not harmless.[14]

### 3. Remedy

■■■ Having found OFAC's error not harmless, I must now determine what remedy is appropriate. KindHearts states: "Putting aside the Court's other constitutional holdings, KindHearts agrees with OFAC that the typical remedy for an unconstitutional agency process includes 'remand ... with instructions as to what additional process is due.' " [Doc. 112, at 42 (citing Doc. 110, at 36–37) ]. KindHearts then continues, however: "OFAC resists the necessary accompaniment to remand: setting aside the extant, unconstitutional order." [*Id.* at 43]. The government responds that solely remand is appropriate.[15]

---

**12.** As regards the "hundreds of pages of briefing and several hours of oral argument" the government points to, [Doc. 110, at 30], oral summarization and repetition of constitutionally inadequate notice does not render it constitutionally adequate.

**13.** This conclusion—that the notice provided KindHearts remains inadequate—distinguishes this case from *Al Haramain, supra,* 2009 WL 3756363, to which the government points in arguing its due process violations were harmless.

In *Al Haramain,* the district court found that "the redesignation notice" included "a lengthy explanation" of the grounds for the government's designation decision, and that "[s]uch a comprehensive notice would have provided AHIF–Oregon [the plaintiff] with the facts and law and would have given it the opportunity to respond to OFAC's concerns in a knowing and intelligent way." *Id.,* *7. The reason for the district court's determination that the due process violation was harmless, therefore, rested upon the *delay* in providing constitutionally acceptable notice, not in the *continued absence* of such notice.

By contrast, here I found OFAC's notice to KindHearts failed constitutionally *both in delay and in substance.* The court in *Al Haramain's* determination on this issue, therefore, is inapposite to the situation here.

**14.** In their remedy briefs, the parties attempt to argue, to the extent possible, about the merits of OFAC's decision. Until KindHearts receives constitutionally adequate notice and a meaningful opportunity to respond, this exercise is futile given the error's non-harmless nature. I thus refrain, at this point, from considering the merits of the OFAC's actions.

**15.** Because I separately address the remedies for OFAC's other constitutional violations, I here consider solely OFAC's failure to provide

The Sixth Circuit has held that a court may remedy constitutional notice and hearing violations through remand for appropriate proceedings. *Women's Med. Prof'l Corp. v. Baird,* 438 F.3d 595, 616 (6th Cir.2006). The District of Columbia Circuit agreed in *National Council of Resistance of Iran v. Department of State,* 251 F.3d 192, 209 (D.C.Cir.2001):

> We recognize that a strict and immediate application of the principles of law which we have set forth herein could be taken to require a revocation of the designations before us. However, we also recognize the realities of the foreign policy and national security concerns asserted by the Secretary in support of those designations.... We therefore do not order the vacation [sic] of the existing designations, but rather remand the questions to the Secretary with instructions that the petitioners be afforded [due process].

*Cf. Fla. Power & Light Co. v. Lorion,* 470 U.S. 729, 744, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985) ("[I]f the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency[.]").

This is especially appropriate because, "since [I am] not the [agency] decision-maker[ ], it would be inappropriate for [me] to presume what decision might be reached" were KindHearts afforded adequate notice and an opportunity to respond. *Baird, supra,* 438 F.3d at 616.

I thus agree with the government—and the reasoning of the District of Columbia Circuit in *National Council of Resistance of Iran*—that, notwithstanding the APA's dictate that we set aside unconstitutional agency action, the proper remedy for a

notice violation in the context of designation proceedings is to remand to OFAC, without vacatur of the BPI, with instructions as to what additional notice is required.

This leaves me with the difficult question of precisely *what* the government must disclose to KindHearts to provide KindHearts with adequate notice. On this issue, the government notes:

> The Court has thus far expressed no opinion on what specific process must be provided beyond that which has to date been provided. OFAC has at this time given a complete statement of the unclassified, non-privileged reasons for the blocking and has provided KindHearts with all of the unclassified, non-privileged evidence being considered by the agency. There is possibly nothing else that can be done[.]

[Doc. 110, at 38 n. 18].

KindHearts responds: "If the only evidence that would provide KindHearts adequate notice is classified, OFAC is constitutionally obligated to devise a reasonable alternative that affords KindHearts a meaningful opportunity to respond." [Doc. 112, at 42].

I appreciate the government's interest in national security and foreign policy implicated here. *See* Section I.B, *supra* (citing *Egan, supra,* 484 U.S. at 529–30, 108 S.Ct. 818; *Chicago & S. Air Lines, supra,* 333 U.S. at 111, 68 S.Ct. 431; *Smith, supra,* 899 F.2d at 569). As also noted above, however, the judiciary's role is to ensure the protection of individual rights. *Id.* (citing *Hamdi, supra,* 542 U.S. at 536, 124 S.Ct. 2633; *Trop, supra,* 356 U.S. at 103–04, 78 S.Ct. 590; *Blaisdell, supra,* 290 U.S. at 426, 54 S.Ct. 231; *Brill, supra,* 783 F.Supp. at 346).

KindHearts with notice and a meaningful opportunity to respond.

Courts have found that their duty to protect individual rights extends to requiring disclosure of classified information to give a party an ability to respond to allegations made against it.[16] *See American–Arab Anti–Discrimination Comm. v. Reno (ADC)*, 70 F.3d 1045, 1070–71 (9th Cir. 1995); *see also Joint Anti–Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 170, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring) ("The heart of the matter is that democracy implies respect for the elementary rights of men, however suspect or unworthy; a democratic government must therefore practice fairness; and fairness can rarely be obtained by secret, one-sided determination of facts decisive of rights."); *Bismullah v. Gates*, 501 F.3d 178, 187 (D.C.Cir.2007) (providing security-cleared detainees' counsel access to classified documents), *vacated*, —— U.S. ——, 128 S.Ct. 2960, 171 L.Ed.2d 881 (2008) (mem.), *reinstated*, Order No. 06–1197 (D.C.Cir.2008), *dismissed for lack of jurisdiction*, 551 F.3d 1068 (D.C.Cir.2009).

The Fourth Circuit likewise observed in *In re Washington Post Co.*, 807 F.2d 383, 391–92 (4th Cir.1986):

> [T]roubled as we are by the risk that disclosure of classified information could endanger the lives of both Americans and their foreign informants, . . . blind acceptance by the courts of the government's insistence on the need for secrecy, without notice to others, without argument, and without a statement of reasons, would impermissibly compromise the independence of the judiciary and open the door to possible abuse.

*See also Kiareldeen v. Reno*, 71 F.Supp.2d 402, 414, 418 (D.N.J.1999) (holding that the government's use of classified evidence in detention-pending-deportation proceedings violated detainee's due process rights and, *inter alia*, justified his release).

The rationale for requiring such disclosure is that, otherwise, an individual or entity accused of terrorist connections, "like Joseph K. in *The Trial* [,] . . . [can prevail only if he can] prove that he is not a terrorist regardless of what might be implied by the Government's confidential information. It is difficult to imagine how even someone innocent of all wrongdoing can meet such a burden." *Rafeedie v. INS*, 880 F.2d 506, 516 (D.C.Cir.1989).

In *ADC*, the Ninth Circuit faced this issue in the context of immigration: aliens challenged the use of classified information in adjudicating their applications for legalization. The court held that the government's use of classified information violated an individual's right to due process. 70 F.3d at 1071. In so holding, the court noted that the government's reliance on classified evidence undermined the adversarial system and created an enormous risk of error. *Id.* at 1069–70. The court further explained:

> Only the most extraordinary circumstances could support one-sided process. We cannot in good conscience find that the President's broad generalization regarding a distant foreign policy concern and a related national security threat suffices to support a process that is inherently unfair because of the enormous

---

**16.** It bears noting that several related federal statutes contemplate disclosure—or alternatives to the use—of classified evidence. For example, FISA allows a judge to "disclose to the aggrieved person, under appropriate security procedures and protective orders, portions of the application, order, or other [classified] materials relating to the surveillance[.]" 50 U.S.C. § 1806(f); *see also* 8 U.S.C. § 1534(e)(3) (contemplating, in deportation proceedings, either provision of an adequate unclassified summary of the classified information or, if that is not possible, disclosure of the necessary classified information to a "special attorney" who may examine the information without disclosure to his or her client).

risk of error and the substantial personal interests involved.

*Id.* at 1070.

 Drawing on those cases, I propose, subject to giving the parties an opportunity to comment and be heard, that:

1. I convene, under 8 U.S.C. § 1189(b)(2), an *ex parte, in camera* meeting with the government to determine what classified evidence will give KindHearts adequate notice,[17] and whether that evidence is capable of further declassification or adequate summarization;

2. If so, the government will expeditiously declassify and/or summarize whatever classified information I find will give KindHearts constitutionally adequate notice;

3. If declassification or summarization of classified information is insufficient or impossible, then KindHearts' counsel will obtain an adequate security clearance to view the necessary documents, and will then view these documents *in camera*, under protective order, and without disclosing the contents to KindHearts; and

4. The government will then provide KindHearts' counsel with an opportunity to respond to these documents (through a closed, classified hearing if KindHearts' counsel views classified information).[18]

### III. APA Violation: Attorney Fee Policy

In my August 18 Order, I held that OFAC's application of its attorney fee policy (policy) to KindHearts, and thus the limited extent to which KindHearts' blocked funds are available to it to compensate its counsel, was arbitrary and capricious, and violated the APA. *KindHearts I, supra,* 647 F.Supp.2d at 916–20. I turn now to the remedy for this violation.

KindHearts asks that I "remand to OFAC and order it to license payment from blocked funds of all reasonably incurred legal fees in connection with KindHearts' administrative and judicial challenges to OFAC's BPI and threatened designation." [Doc. 107, at 31]. The government argues: 1) it reasonably applied the policy to KindHearts' attorneys;[19] and 2) if I determine that its application of the policy to KindHearts was arbitrary and capricious, the appropriate remedy is to remand to OFAC for additional decision-making.

For the reasons that follow, I remand to OFAC for decision-making consistent with this and my August 18 Order.

Under the APA, I shall: 1) "compel agency action unlawfully withheld or unreasonably delayed"; and 2) "hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary [or] capricious." 5 U.S.C. § 706(1)-(2)(A).

---

**17.** I here specify that adequate notice includes, *inter alia,* disclosure to KindHearts of *each* legal basis for the BPI. Were I to hold otherwise, my holding would be ineffectual, because no matter what evidence KindHearts adduced to rebut the disclosed bases for the BPI, the government could point to the other, unknown, bases in refusing to release KindHearts' funds.

**18.** I find the subsequent notice as ordered here, once provided, renders harmless OFAC's violation regarding the *promptness* of

the notice provided KindHearts, and no separate or other remedy is needed or appropriate. This is so because I have stayed designation proceedings pending adjudication of these constitutional violations. *See KindHearts II, supra,* 676 F.Supp.2d at 656–57.

**19.** The government reasserts its merits arguments regarding the application of the policy to KindHearts. Because I held in my August 18 Order that OFAC's actions were arbitrary and capricious, I decline to further address these arguments here.

■ Generally, where a court finds an agency's action arbitrary or capricious, it should remand to the agency rather than conduct a *de novo* review. *Kroger Co. v. Reg'l Airport Auth. of Louisville & Jefferson County*, 286 F.3d 382, 387 (6th Cir. 2002) (citing *Fla. Power & Light Co.*, *supra*, 470 U.S. at 744, 105 S.Ct. 1598).

■ " '[D]e novo review is appropriate only where there are inadequate factfinding procedures in an adjudicatory proceeding, or where judicial proceedings are brought to enforce certain administrative actions.' " *Id.* (citing *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973)). A court need not remand to an agency when:

(1) although the agency failed to abide by the proper procedures of the APA, it arrived at its conclusion in another manner which was valid under the APA, *NLRB v. Wyman–Gordon Co.*, 394 U.S. 759, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969); or (2) even if the agency did not abide by the proper regulations, the agency took corrective action, making remand meaningless, *A.L. Pharma, Inc. v. Shalala*, 62 F.3d 1484 (D.C.Cir.1995) (holding that remand was meaningless on one issue, but still remanding the case to the agency on another issue); or (3) plaintiffs conceded the issue to be decided on remand, *Amer. Train Dispatchers Ass'n v. ICC*, 26 F.3d 1157 (D.C.Cir.1994); or (4) although the agency stated erroneous legal reasons for its conclusion, the agency's conclusion was "the only possible legal result," as dictated by statute and/or Supreme Court precedent, *Motion Picture Ass'n of America v. Oman*, 969 F.2d 1154, 1158 (D.C.Cir.1992).

*Nat'l Air Traffic Controllers Ass'n v. Sec'y of Dep't of Transp.*, 997 F.Supp. 874, 884 (N.D.Ohio 1998).

None of these exceptions are present here.

■ I do not intend to repeat my earlier opinion in its entirety here. For clarity, I reiterate the basic findings of my August 18 Order: 1) OFAC has not provided a sufficient statement of reasons for authorizing less than the full amount of attorneys' fees requested; 2) OFAC has not addressed the effect of certain special circumstances, such as the complexity of issues and its own unresponsiveness on the generation of attorneys' fees; and 3) there is a disconnect between the purposes underlying the policy, as described by OFAC, and OFAC's denial of access to blocked funds for attorneys' fees.

The policy states that its monetary limitations are "modeled generally on the attorney compensation provisions of the Criminal Justice Act (CJA) and the Equal Access to Justice Act (EAJA)." [AR 1706]. The policy limits attorneys' fees to a rate of $125 per hour, the limit set by the EAJA. The policy, like the CJA, also incorporates total litigation fee caps. These caps can be doubled in extraordinary cases.

The EAJA and the CJA provide a strong foundation for OFAC's attorney fee policy. OFAC has, however, weakened its footing by failing to incorporate the waiver provision present in the CJA.[20]

Under the CJA:

Payment in excess of any maximum amount provided in paragraph (2) of this subsection may be made for extended or

---

**20.** Under the EAJA, an attorney can request a fee rate in excess of $125 if the court determines that an increase in the cost of living or a special factor justifies a higher fee. *Bryant v. Comm'r of Soc. Sec.*, 578 F.3d 443, 449–50

(6th Cir.2009) (citing 28 U.S.C. § 2412(d)(2)(A)). · Because I do not find that OFAC's fee rate cap of $125 in this case was arbitrary or capricious, I do not address this issue further.

complex representation whenever the court in which the representation was rendered, or the United States magistrate judge if the representation was furnished exclusively before him, certifies that the amount of the excess payment is necessary to provide fair compensation and the payment is approved by the chief judge of the circuit. The chief judge of the circuit may delegate such approval authority to an active or senior circuit judge.

18 U.S.C. § 3006A(d)(3).

In fact, "the statutory maximum is waived so often that the Administrative Office of the U.S. Courts has created standard CJA Form 26 for counsel to complete in order to assist the court in making its certification." Randall W. Schnack, *Appointment and Payment of Counsel Under the Criminal Justice Act: Everything You Always Wanted to Know But Were Afraid to Ask*, 53 FED. LAW. 37, 40 (July 2006).[21]

As I previously held, OFAC's adoption of the policy was not arbitrary and capricious on its face. *KindHearts I, supra*, 647 F.Supp.2d at 915–16. Its failure to include the waiver provision of the CJA does not render it so. It does, however, increase the policy's susceptibility to arbitrary and capricious application, like the application that occurred here.

For the reasons discussed above and in my August 18 Order, I remand to OFAC for decision-making consistent with these opinions.

## Conclusion

For the foregoing reasons, it is hereby:

ORDERED THAT:

1. The government shall show probable cause as provided herein;

2. The government shall provide KindHearts with notice of the basis for its BPI as provided herein;

3. On the issue of attorneys' fees, the case be, and hereby is, remanded to OFAC for further consideration of KindHearts' pending and future applications for licensing and release of KindHearts' funds to compensate its attorneys; and

4. The stay previously issued preventing the government from continuing designation proceedings—*KindHearts II, supra*, 676 F.Supp.2d 649—shall, and hereby does, remain in effect pending compliance with this Order and/or further court Order.

The Clerk shall arrange a status conference to schedule the further proceedings being set herein before the undersigned; prior to said conference, the parties shall confer with regard to the timetable and such other matters that they believe need addressing at the status conference, and shall submit status report(s) not later than one week prior to the conference.

So ordered.

---

21. If OFAC decides to institute a cap waiver system, like that present in the CJA, it could accommodate its concerns about loss of blocked assets by using a system: 1) similar to its present periodic licensing system for requests for fees above the cap; or 2) where periodic fee requests are made to a judge, with OFAC having the right to oppose and be heard on the requests as they are filed.